BAKER, JUDGE:
This is an action for breach of contract involving a multi-prime project for the construction of the Marshall University Fine Arts Center in Huntington, Cabell County. Marshall University is a facility under the auspices of the Board of Trustees of the University of West Virginia, respondent herein.
Although this project was first bid as a single-prime contract, the bids were rejected as too costly. The project was subsequently re-bid as seven separate prime contract. C & L Construction Company, Inc., hereinafter referred to as C & L, alleges that confusion resulted in this re-bid transformation of the plans from single to multi-prime: Questions arose as to which of the seven contractors would be responsible for specific work duplications and omissions resulted; approximately 200 change orders were made.
The claimant was responsible for the Structural Steel and Metal Decking contract. However, claimant raised questions concerning items variously referred to as spandrel lintels or spandrel beams, and catwalks or fly floor framing, claimed that such items were not a part of its work, and sought additional compensation through requested change orders, asserting that these were covered under the Miscellaneous Iron section of the General Contract. C & L also alleges that it was required to perform additional work from a redesign of the fly tower, the mislocation of anchor bolts by the general contractor, the use of leveling nuts instead of leveling plates, and its being required to grout the base plates. It seeks $750,000.00 in damages. The Court must determine whether C & L is entitled to be compensated for changes in the work which comprise this claim , and then determine the amount, if any, which C & L may recover as an award from the Court. The requested change orders will be considered by the Court, respectively, as issues:
REQUESTED CHANGE ORDERS
CHANGE ORDER NO. 5 SPANDREL LINTELS (SPANDREL BEAMS)
CHANGE ORDER NO. 6 CATWALKS (FLY-FLOOR FRAMING)
CHANGE ORDER NO. 7 FLY TOWER REDESIGN
CHANGE ORDER NO. 8 MISLOCATED ANCHOR BOLTS-SLOTTING BASE PLATES
CHANGE ORDER NO. 9 DELETION OF LEVELING PLATES; ADJUSTING LEVELING NUTS; GROUTING BASE PLATES
The respondent avers that the work covered by the requested change orders nos. 5,6, and 9 was included in claimant’s contract; that the materials included in requested change orders nos. 5 and 6 were furnished by C & L’s subcontractor, Trojan Steel Company, hereinafter referred to as Trojan, under its original bid to C & L when the project was bid and that to allow C & L to recover the cost of such materials from respondent under these change orders would constitute unjust enrichment; that the amounts claimed under requested change order nos. 7 and 8 were greatly overstated; and that C & L did not provide notice to respondent of its intentions to file *193 claims related to certain of the requested change orders in a timely manner.
Requested change orders nos. 5 and 6 both relate to a document which C & L alleges it relied upon in calculating its bid to respondent. This document was prepared by V. J. Associates and is titled as follows:
FINAL BUDGET ESTIMATE
FINE ARTS CENTER
PHASE I
MARSHALL UNIVERSITY
HUNTINGTON, WEST VIRGINIA
DECEMBER 12, 1988
This budget estimate was prepared for the architect of the Fine Arts Center by V. J. Associates to provide an estimate of costs for the construction of this project. A representative of the respondent, J. C. Kotas, provided a copy of this document to C & L prior to the bids being received by the respondent when the multi-prime contracts were being let. Mr. Kotas testified that he delivered the V. J. Associates Estimate of Jeff Moffitt, one of the owners of C & L, because there had been no representatives of C & L at meetings with other bidders. His purpose for providing this document was to ascertain the accuracy of the tonnage of steel for the project. Mr. Kotas did not discuss any of the particulars in the estimate with Jeff Moffitt. C & L contends that it relied upon portions of this document which list items to be provided by the structural steel contractor and those items to be provided by the general contractor as a part of the miscellaneous iron. In the multi-prime bidding process, the miscellaneous iron was a part of the general contractor’s obligation. C & L contends that it had every right to rely upon this document based upon the fact that it was provide by the owner, respondent herein. It is necessary for the Court to address and to render its decision as to this issue before it affects the Court’s consideration of requested change orders nos. 5 and 6. This document appears to be an extraneous document provided to the contractor for limited purposes. C & L was informed at a pre-bid meeting held in May 1989 that all items on the structural drawings, S-l — S-20, were a part of the structural steel bid. In Addendum No. 3 to the contract, the questions and answers at the pre-bid conference were recited and the information was reiterated for the bidders that the structural steel bid was the work shown on the structural drawings S-l — S-20, and in the contract documents at §05300 - Metal Decking. Miscellaneous iron was stated to be a part of the general contractor’s contract and was shown on the architectural drawings with reference made to three sections of the contract. The Final Budget Estimate prepared by V. J. Associates was not one of the Bid Documents. It appears to the Court that a reasonable, prudent contractor would not rely upon an extraneous document in bidding a project. In retrospect, it is regrettable that the respondent furnished the Final Budget Estimate to the claimant, but if C & L was misled by the information in the V. J. Associates Estimate to its detriment, it can only look to itself. The contract documents are controlling and the Court will base its decision upon those documents.
The Court will now consider each requested change order which constitutes a claim *194 and its decision as to C & L’s entitlement to any additional compensation for each such requested change order.
REQUESTED CHANGE ORDER NO. 5
Requested change order no. 5 is for additional work which C & L alleges twas required by it for providing and installing steel spandrel lintels. There was a disagreement between the parties as to the terms “lintel” and “spandrel beam. ” The American Institute of Steel Construction Code of Standard Practice for Steel Buildings and Bridges (hereinafter referred to as the AISC Code) defines Structural Steel as follows:
§2.0 Classification of Materials
2.1 Definition of Structural Steel
“Structural Steel,” as used to define the scope of work in the contract documents, consists of the steel elements of the structural steel frame essential to support the design loads. Unless otherwise specified in the contract documents, these elements consist of material shown on the structural steel plans and descried as: (A list of items follows and includes this reference)
Lintels, if attached to the structural steel frame. (Emphasis supplied).
As described by Gerard J. D’Huy, an expert engineer who testified for the respondent, the spandrel beams required by the contract consisted of several members including a tube section, plates, and angles. These members were delivered to the project as a unit which had to be hoisted by a crane in place between columns and then bolted to the structural steel frame by iron workers. The description of the spandrel beams is included int the structural drawings on S-19 under the legend “SPANDREL BEAM SCHEDULE” for fabrication purposes and a note to the steel erector referring to the Architectural Drawings for determining where the beams were to be located and for information as to the length of each beam. There were also steel members referred to as hung and loose lintels which were required to be provided and installed by the general contractor as a part of miscellaneous iron. C & L contends that the references to the miscellaneous iron section of the contract through the Architectural Drawings further complicated its understanding of whether the spandrel beams were to be included in its bid. C & L contends that the references to both sets of plans for these beams created an ambiguity in the contract and it, therefore, is entitled to be compensated for supplying the steel and for the cost of erection. As indicated above in the definition from the AISC Code, lintels are structural steel if attached to the structural steel frame. If these spandrel beams are considered to be lintels as C & L contends, it is clear that these were a part of its contract as defined by the AISC Code.
The evidence also establishes that C & L subcontractor (Trojan) which fabricated *195 the steel for C & L had included the spandrel beams in its takeoff, to work up the bid to C & L, and thus it was paid in full by C & L for the steel. In fact, Trojan did not make a claim against C & L for additional compensation for providing the steel for the spandrel beams. The Court has determined that the structural steel drawings provided sufficient notice to C & L that the spandrel beams were, in fact, a part of its contract. There does not appear to be any ambiguity in the contract documents and this is substantiated by the fact that Trojan reviewed the same drawings and included the steel members in its bid to C & L. The Court denies any claim for requested change order no. 5 in its entirety. In light of this determination the Court deems it unnecessary to consider the question of the timeliness of notice by claimant as to this claim.
REQUESTED CHANGE ORDER NO. 6
Requested change order no. 6 is a claim for the installation of an assembly identified as a catwalk or fly floor framing. C & L contends that its contract included neither the fabrication of the steel nor the installation of a catwalk in the stage area. The catwalk is depicted on S-5 in detail and is also shown on A-6. C & L contends that the catwalk was a part of the miscellaneous iron section of the contract, and, therefore, the general contractor had the responsibility to fabricate and install this section above the stage. However, S-5 provides the details for steel and refers to this item as fly floor framing, which is different from a catwalk. In general, catwalks are a part of miscellaneous iron because catwalks are hung from above. Respondent contends that this particular section of the stage area is actually fly floor framing rather than a typical catwalk, because it is a very heavy structure and must be supported from below rather than being hung in the typical catwalk manner. The fly floor framing was delivered by Trojan in large sections which were pre-bolted and the sections were set in place by C & L with the use of a crane.
C & L’s position is that the contract did not contemplate that the structural erector would fabricate and construct this particular catwalk as §05500 - Metal Fabrications in the contract listed the items which were a part of the miscellaneous iron as follows:
§2.23 Miscellaneous Items
A. Catwalks and Platforms: Provide steel catwalks and platforms designed to support a live load of not less than 50 lbs. psf, complete with gratings, toe guards, railings, steel framing, bracing and support members. Comply with requirements specified for railings.
Provide steel plate flooding or aluminum grating where shown.
Another section of the contract under miscellaneous iron also provided the following information to bidders:
§3.05 Miscellaneous Items
*196 B. Catwalks and Platforms: Install catwalks and platforms as shown and to safely support design live loads.
C & L contends that the above sections in the contract indicated to the bidder that catwalks were a part of miscellaneous iron rather than structural steel. Both sets of drawings depict this steel structure. On the Structural Drawing S-5 it is referred to as “Fly Floor Framing.” On the Architectural Drawing A-6 which is titled “PLAYHOUSE CATWALK LEVEL AND DETAILS,” there is also a depiction of the item in question. C & L’s position is that an discrepancies in the plans and specifications are resolved by looking to the specifications and it substantiates this position by citing §3.3 of the AISC Code which states as follows:
§3.3 Discrepancies
In case of discrepancies between plans and specifications for buildings, the specifications govern....
C & L raised this issue on the project site at a meeting on March 28, 1990, and advised project personnel that the fly floor framing which is referred to in the minutes of the meeting as “Fly Tower Catwalks” was not its work. C & L was later advised that it would be required to provide the steel and erect this item. C & L further contends that Trojan Steel did not include all of the steel for the fabrication the fly floor framing in its take-off to C & L during the bidding of the project. There was testimony from S. Ray Karr, one of the owners of the general contractor for this project, that the fly floor framing was confusing to him as it was depicted in both the architectural and the structural drawings. He testified that he called the architect with a question concerning Addendum No. 3 for clarification as to which contractor was responsible for the fly floor framing. He was informed that it was a part of the structural steel contract. This conversation took place pre-bid, but the information was not relayed to any of the other bidders. The Court notes that Todd Smith, an employee of Trojan, testified that all of the steel in the fly floor framing, including the crossover portion was included in its takeoff; therefore, when it was directed by C & L to fabricate the steel, Trojan did not request a change order from C & L although it did send a letter to C & L indicating that this catwalk was not a part of structural steel. All of the steel for the fly floor framing, including the crossover portion, was delivered to the project and installed by C & L.
The Court, having reviewed the drawings and the testimony concerning this item, is of the opinion that the fly floor framing was included as a part of the structural steel contract. Structural drawing S-5 contains all of the pieces of steel for this section, and, in fact, it is labeled “fly floor framing” on the drawing. This should have alerted C & L that the item was not a catwalk. The fly floor framing does not hang from above as would a normal catwalk, rather it is supported from below by steel members. Thus, the Court denies any additional compensation to C & L for requested change order no. 6.
REQUESTED CHANGE ORDER NO. 7
*197 Requested change order no. 7 is for the redesign of the fly tower which is located in the stage area of the building and is related to the fly floor framing referred to in requested change order no. 6. The redesign involved a column which in the original plans was abut the fly floor framing. However, the architect determined that additional bracing was necessary for the fly floor and the redesign was effected. The column involved in this claim was designed to extend below the fly floor framing with braces extending to support the fly floor framing. There is no dispute by the parties that C & L performed the work related to the redesign and that C & L is entitled to payment for any additional material and work related to the design. C & L alleges that it was necessary to provide additional temporary framing, additional guy cables, cable clamps, turnbuckles, additional labor, and additional equipment, for a total claim for $17,179.32. Respondent argues that C & L is entitled to no more than $5,000.00 for the additional work caused by the redesign of the fly tower. Both parties agree that C & L is entitled to the amount of $2,480.00 which represents the cost of an additional temporary beam required by the redesign. Respondent disputes the necessity for guy cables, cable clamps, and turnbuckles, as the original design also contemplated the use of such equipment. Section 7.9.1 of the AISC Code states that temporary support will be determined, furnished, and installed by the steel erector, and §7.9.5 states that such temporary supports are not the property of the owner. It is not material for which an owner pays a contractor as the use of such items is contemplated in the bid. Although C & L may have included the value of rent of such guy cables and other support items in its original bid, C & L has established that additional guy cables and other support items were required by the design. The Court has determined that C & L has established its entitlement to additional compensation in the redesign of the fly tower and that the amount of $14,239.46 is a fair and reasonable award for this change order.
REQUESTED CHANGE ORDER NO. 8
Requested change order no. 8 is for extra work required of C & L in slotting the base plates for the columns as a result of the general contractor having mislocated anchor boles. During the construction of the project the general contractor placed the anchor boles in the concrete for the columns. C & L was required under the terms of the contract to survey there anchor bolts were located beyond the accepted tolerance of one-fourth inch. Each column had sets of anchor bolts in twos or fours. C & L alleges that it was necessary to use a crane for additional time and that it incurred additional labor expenses in order to perform the slotting work on the base plates prior to the placement of the columns. C & L claims additional expenses in the amount of $15,330.00 for this change order.
The Court is of the opinion that C & L is entitled to payment for the additional man hours and equipment time required to slot the base plates. This is difficult work on a project and C & L chose to use a crane to hold the columns while the base plates were slotted. As the steel erector, C & 1 had a choice in its mode of operation. It has been established that there were problems in at least thirteen instances which required slotting the base plates. Therefore, the *198 Court has determined that C & 1 is entitled to an award for this change order and that the amount of $15,330.00 is a fair and reasonable award.
REQUESTED CHANGE ORDER NO. 9
Requested change order no. 9 involves two claims. The first part is a claim for extra time that C & L alleges it expended in setting the columns by the use of leveling nuts rather than to place them on leveling plates which it alleges was contemplated by the contract. C & L refers to a section of the contract which mentions leveling plates; however, it has been established that the general contractor also was required to use leveling plates on the project as part of the miscellaneous iron. Leveling plates were required in such areas as where staircases were installed. In Contract §05500-Metal Fabrications, §2.12 provides as follows:
§2.12 Loose Bearing and Leveling Plates
A. Provide loose bearing and leveling plates for steel items bearing on masonry or concrete construction, made flat, free from warps or twists, and of required thickness and bearing area. Drill plates to receive anchor bolts and for grouting as required. Galvanize after fabrication.
A review of the documents makes it clear to the Court that this provision did in fact relate to the miscellaneous iron portion of the work and not to the structural steel. The Court is of the opinion that the respondent has established that C & L should not have contemplated the use of leveling plates as this mode of erecting columns is not normally used in leveling columns on construction project. Structural drawing S-10 has a note that the base plates shall be set on leveling nuts and a minimum of one and one-half inches of non-shrink gout will be used. The Court is of the opinion that C &L is not entitled to any extra payment because it was required to use leveling nuts as the structural drawing provided sufficient explanation to the bidder. As an experienced steel erector, C & L should have raised a question if it could not determine whether leveling plates or leveling nuts were to be used on the project.
The second part of this requested change order is for work performed by C & L in grouting the base plates. C & L contends that this is work generally performed by the general contractor as laborers or carpenters are responsible for grouting work. This contention may be true where there is a single-bid project and the general contractor designates duties to the steel erectors and the general laborers on the project. However, this was a multi-prime contract and the Court has determined that C & L was required under the terms of the contract to grout the base plates. The contract itself requires grouting on the part of the steel erector as noted int the contract at §05120 for the structural erector and more specifically at §1.03 (a)(4) Shrinkage-resistant grout. Although there are references to grout int the other sections of the contract, these applied to the general contractor as grout is used on other areas of projects. As C & L was required to perform this work in its contract, the Court denies this claim in its entirety.
*199 Thus, the Court has determined that C & L has established entitlement to additional compensation for requested change order nos. 7 & 8, for which the Court grants an award in the sum of $29,569.46, plus interest calculated by the Court in accordance with the provisions in W.Va. Code §14-3-1 to be $1,879.56 on the amount awarded for the work claimed under requested change order no. 7, and $2,205.00 on the amount awarded for the work claimed under requested change order no. 8, for a total award of $33,654.02.
Award of $33,654.02.